*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMES C. CITTA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | OPINION |
| v. | : | Civil Action No.: 09-865 (FLW) |
| | : | |
| | : | |
| BOROUGH OF SEASIDE PARK, *et. al.* | : | |
| | : | |
| | : | |
| | : | |
| Defendants | : | |
| | : | |

**<u>WOLFSON, United States District Judge</u>**:

On February 26, 2009, Plaintiff James Citta ("Plaintiff" or "Citta") filed the instant action against the Borough of Seaside Park, the Seaside Park Police Department, Chief of Police William Beining III, Mayor Robert W. Matthies, Borough Administrator Julie Horner-Keizer, and every member of the Borough Council (collectively "Defendants") to recover damages arising from allegedly discriminating and harassing conduct by Defendants while he was employed as a Seaside Park police officer. Specifically, Plaintiff's Complaint asserts five causes of action: (1) violation of the First Amendment to the United States Constitution; (2) Violation of the New Jersey Constitution Article I, Paragraphs 1 and 6; (3) constructive discharge; (4) tortious interference with employment agreement; and (5) discrimination based upon Plaintiff's appearance and/or disability, in violation of federal and state law. Presently before the Court is Defendants' Motion for Summary Judgment seeking to dismiss Plaintiff's Complaint as a matter

of law.  For the reasons stated below, Defendants' Motion for Summary Judgment is GRANTED as to all causes of action, and Plaintiff's claims are dismissed.

**BACKGROUND**

Plaintiff asserts that during the course of his employment with the Seaside Park Police Department, Defendants discriminated against him because he was overweight, prevented him from making statements to the Borough Council, the media, and the public concerning issues and/or rumors which had been spread about him, and that Defendants retaliated against him for engaging in or expressing his interest to engage in federally-protected speech or otherwise performing the duties of his employment.  Compl. ¶¶ 71, 72, 88.  Further, Plaintiff alleges constructive discharge, arguing that because of Defendants' conduct, Plaintiff's working conditions were so intolerable that a "reasonable person in the plaintiff's shoes would have felt compelled to retire or resign."  Compl. ¶78.  The parties dispute certain relevant facts in this case.  Because the Court is considering the facts in the context of Defendants' motion for summary judgment, the Court must view the facts in the light most favorable to Plaintiff.

Plaintiff began his employment with the Police Department in July 1994, after Chief Beining[1] contacted Plaintiff to offer him the position.  Defs.' Stmt. ¶2; Pl.'s Resp. ¶2; Compl. ¶14; see Deposition Transcript of Plaintiff attached to Affidavit of Eric L. Harrison, Esq. as Exhibits B & K (hereinafter "Pl.'s Dep.") 17:14-24.  Plaintiff was given a copy of the Seaside Park Borough Police Department Rules and Regulations ("Rules and Regulations").  Defs.' Stmt. ¶93; Pl.'s Resp. ¶93; Pl.'s Dep. 140:16-20.  In or about 1994 or 1995, a Sergeant in the

---

[1]     Beining was the acting Chief of Police until his retirement in June 2007.  See Affidavit of William Beining attached to the Affidavit of Eric L. Harrison, Esq. As Exhibit C (hereinafter "Beining Aff.") ¶1.

Department placed the issue of Plaintiff's weight on a Department evaluation.   Compl. ¶17. When Plaintiff was evaluated, there were other officers employed in the Department who were also overweight, but were not evaluated.   Plaintiff's Statement of Additional Material Facts (hereinafter "Pl.'s Stmt.") ¶2.   According to Defendants, the other overweight officers were not evaluated because the Department was only evaluating newly hired officers.   Defendants' Response to Plaintiff's Statement of Additional Material Facts (hereinafter "Defs.' Resp.") ¶2.

From the mid-1990s through November 2002, Plaintiff served as President of the Seaside Park Chapter of the New Jersey State Policeman's Benevolent Association ("PBA").   Defs.'s Stmt. ¶10; Pl.'s Resp. ¶10; Pl.'s Dep. 78:2-11. While in that position, Plaintiff filed between six to twelve grievances on behalf of himself and others.[2]   Defs.' Stmt ¶10; Pl.'s Resp. ¶10; Pl.'s Dep. 78:12-18.  Additionally, while serving as PBA President, Plaintiff made a request for a vote of "no confidence" against Chief Beining.   Pl.'s Stmt. ¶67; Defs.' Resp. ¶67; Deposition Transcript of William Beining III attached to Affidavit of John J. Mensching, Esq. as Exhibit B (hereinafter "Beining Dep.") 140:24-141:1.

In or about 1997-1998, Plaintiff was handling Officer Garbe's personal weapon in the locker room when it accidentally discharged.  Defs.' Stmt. ¶21; Pl.'s Resp. ¶21; Beining Aff. ¶3. Plaintiff admits that he handled the gun negligently when it fired.  Defs.' Stmt. ¶21; Pl.'s Resp. ¶21; Pl.'s Dep. 56:2-3.  After the incident, Chief Beining questioned both Plaintiff and Officer Garbe.  Defs.' Stmt. ¶22; Beining Aff. ¶4.   Plaintiff subsequently agreed to accept five (5) days

---

[2]      The official procedure for filing a grievance is set forth in the Collective Bargaining Agreement ("CBA") negotiated between the Borough and the PBA.  Defs.' Stmt ¶66; Pl.'s Resp. ¶66; see Excerpts of the Collective Bargaining Agreement between Defendant Borough of Seaside Park and the Seaside Park Chapter of the Policeman's Benevolent Association, effective January 1, 2005 through December 31, 2007 attached to Affidavit of Eric L. Harrison, Esq. as Exhibit D (hereinafter "Collective Bargaining Agreement") pp4-5, Article V.

vacation time as punishment, and did not appeal the penalty.  Defs.' Stmt. ¶23; Pl.'s Resp. ¶23; Pl.'s Dep. 56:11-13.  Officer Garbe was not disciplined as a consequence of the incident.  Pl.'s Stmt. ¶61; Defs.' Resp. ¶61; Beining Dep. 94:17-96:3.  Plaintiff asked Chief Beining how Officer Garbe was dealt with regarding the discharge incident, however Plaintiff was not permitted to see the investigation materials.  Pl.'s Resp. ¶24;Pl.'s Dep. 64:15-18; see also Defs.' Stmt. ¶25.  Under the Department's Rules and Regulations, "confidential business of the Department" is not to be disclosed to "anyone except those for whom it is intended."  Defs. Stmt. ¶88; Pl.'s Resp. ¶88; Rules and Regulations at p56.  Additionally, "the contents of any Department record or report filed in the Department shall not be exhibited or divulged to any person, except on approval of the Chief of Police, or under due process of the law, or as permitted under Department Regulations."  Defs.' Stmt. ¶89; Pl.'s Resp. ¶89; Rules and Regulations at p56.

In or about the Spring of 1999, Plaintiff issued citations to members of the fire department for parking in violation of a state statute.  Defs.' Stmt. ¶26; Pl.'s Resp. ¶26; Pl.'s Dep. 40:5-16; see also Pl.'s Stmt. ¶5; Defs.' Resp. ¶5.  Plaintiff alleges he was reprimanded for issuing the summonses, and told that writing summonses to firefighters was "a bad career move;" however, he did not receive a written reprimand.  Defs.' Stmt. ¶26; Pl.'s Resp. ¶26; Pl.'s Dep. 45:10-12.  Also in or about 1999, Plaintiff asked Chief Beining for permission to investigate possible misconduct on the part of the acting Borough Administrator.  Defs.' Stmt. ¶ 63; Pl.'s Resp. ¶63.  There was a complaint that phone calls to pornographic "chat" lines were being made from the Borough Hall at night.  Pl.'s Dep. 129:25-130:9.  Plaintiff complained to Chief Beining that the Borough Administrator was at the Borough Hall at "odd" hours at night

and might be responsible for the inappropriate calls.  Defs.' Stmt. ¶63; Pl.'s Resp. ¶63.  As part of the investigation into the inappropriate calls, Chief Beining directed Plaintiff and another officer to take statements from people who worked in the town.  Defs.' Stmt. ¶63; Pl.'s Resp. ¶63.

In 2000, Chief Beining assigned Plaintiff to be an investigator.  Defs.' Stmt. ¶29; Pl.'s Resp. ¶29; Compl. 22.  As an investigator, Plaintiff did not lose pay or any other privilege of employment.  Defs.' Stmt. ¶30; Pl.'s Resp. ¶30; Pl.'s Dep. 96:15-17.  Plaintiff was not bothered by the new position and testified that he enjoyed doing that kind of work.  Defs.' Resp. ¶11; Pl.'s Dep. 95:17-23, 96:8-9.  Plaintiff worked as an investigator for "a couple of years" until August 2003, when he told Chief Beining he no longer wished to work as an investigator.  Plaintiff was thereafter transferred back to uniformed patrol.  Stmt. ¶30; Pl.'s Resp. ¶30; Pl.'s Dep. 96:15-17.  Also during the year 2000, Plaintiff made requests to Chief Beining to speak with the Council, in his capacity as PBA President, about police business with respect to training, equipment and other issues.  Defs.' Stmt. ¶31; Pl.'s Resp. 31; Compl. ¶26.  Plaintiff claims that Chief Beining ordered him not to speak to the Council; however, Plaintiff never filed a grievance to the Council under the written grievance procedure set forth in the CBA.  Defs.' Stmt. ¶31; Pl.'s Resp. ¶31; Pl.'s Dep. 103:6-8, 105:2-4.  Plaintiff also alleges that Chief Beining ordered him not to speak to public officials or in public about Department safety issues, and threatened Plaintiff with insubordination charges if he disregarded these directions.  Compl. ¶27; Pl.'s Stmt. ¶18.

At some time prior to December 2001, Plaintiff's doctor told him that he was morbidly obese.  Pl.'s Stmt. ¶3; Defs.' Resp. ¶3.  Subsequently, Plaintiff voluntarily underwent gastric by-pass surgery in December 2001.  Compl. ¶23.  In 2000, Plaintiff and three other officers passed

the Sergeant's Exam and were placed on the promotion list.  Defs.' Stmt. ¶34; Pl.'s Resp. ¶34; Pl.'s Dep. 68:2-25.  Officers Boag and Garbe scored higher than Plaintiff and were promoted before him.  Defs.' Stmt. ¶34; Pl.'s Resp. ¶34.  In 2003, Chief Beining requested the Council to add another Sergeant position to the table of organization so that Plaintiff could be promoted to Sergeant before the promotion list expired.  Defs.' Stmt ¶36; Pl.'s Resp. ¶36; Beining Aff. ¶7.  The Council granted Chief Beining's request and Plaintiff was promoted to Sergeant in 2003, just before the promotion list expired.  Defs.' Stmt. ¶35; Pl.'s Resp. ¶35; Pl.'s Dep. 71:12-18; Beining Aff. ¶7.  Plaintiff did not replace a Sergeant who retired recently or otherwise left the Department.  Defs.' Stmt. ¶35; Pl.'s Resp. ¶35; Pl.'s Dep. 72:2-5.  According to PBA by-laws and past practice, one could not hold the rank of Sergeant and simultaneously serve as PBA president, and no Sergeant or higher-ranking officer had ever served as PBA President.  Defs.' Stmt. ¶37; Pl.'s Resp. ¶37; Pl.'s Dep. 74:7-18. Plaintiff therefore resigned from his position as PBA President when he was promoted to Sergeant.  Compl. ¶28.

One night shortly after Plaintiff was promoted to Sergeant, Chief Beining ordered him to stay away from the Saw Mill Bar and patrol another area of town instead because too many officers were patrolling that area and neglecting to patrol the rest of the town.  Defs.' Stmt. ¶39; Pl.'s Resp. ¶39; Pl.'s Stmt ¶9; Defs.' Resp. ¶9; Compl. ¶34; Beining Aff. ¶8.  Thereafter, Plaintiff issued in excess of 40 summonses in a residential area of town to residents who had parked their cars on the street facing the wrong direction, in violation of Borough ordinance or State statute. Defs.' Stmt. ¶40; Pl.'s Resp. ¶40; Pl.'s Stmt ¶9; Defs.' Resp. ¶9.  Residents reportedly often parked their cars facing away from the beach during this time of year due to winter weather and storms.  However, there was no local ordinance permitting residents to park

6

on the street facing the wrong way nor was any "practice" of allowing residents to do so codified in any written format or communicated to Plaintiff prior to his issuing the summonses.  Pl.'s Stmt. ¶50; Defs.' Resp. ¶50; Beining Dep. 43:5, 44:8, 45:2-10.  Nonetheless, Plaintiff testified that he knew there "were going to be a lot of complaints because people in that end of town didn't get a lot of tickets written at that time of year in that area of town."  Defs.' Stmt. ¶ 41; Defs.' Resp. ¶9; Pl.'s Dep. 85:19-22.  The next day, Chief Beining spoke to Plaintiff about the parking summonses.  Defs.' Stmt. ¶41; Pl.'s Resp. ¶41; Pl.'s Stmt. ¶9; Beining Aff. ¶10.  Although, Chief Beining told Plaintiff that the summonses should be dropped, Plaintiff refused.  Defs.' Stmt. ¶¶44, 45; Pl.'s Resp. ¶¶44, 45; Pl.'s Stmt. ¶24; Defs.' Resp. ¶24; Pl.'s Dep. 150:11-19, 151:7-8.

Subsequently, Chief Beining changed Plaintiff to the day shift for a period of one to two months.  Defs.' Stmt. ¶42; Pl.'s Resp. ¶42; Plaintiff's Answers to Initial Interrogatories attached to Affidavit of Eric L. Harrison, Esq. as Exhibit E (hereinafter "Pl.'s Answer to Interrogs.") ¶12.  Typically, shift changes were conducted based on seniority or for the betterment of the Department.  Defs.' Stmt. ¶43; Pl.'s Resp. ¶43.  Plaintiff claims that the shift change was punishment for issuing the aforementioned parking tickets to residents, though he did not suffer a loss of income or any other privilege of employment as a result of the shift change.  Defs.' Stmt. ¶42; Pl.'s Resp. ¶42; Pl.'s Stmt. ¶9; Defs. Resp. ¶9; Pl.'s Dep. 89:8-21, 91:5-16.  Plaintiff did not lodge a complaint or file a grievance relating to his shift change.  Defs.' Stmt.¶ 67; Pl.'s Resp. ¶67; Beining Aff. ¶12.  Plaintiff did, however, file a grievance on behalf of Officer Garbe, whom Plaintiff testified was on the night shift but wanted to be on day shift.  Defs.' Stmt. ¶68; Pl.'s Resp. ¶68; Pl.'s Dep. 89:21-90:6.

Following his transfer to the day shift, Plaintiff and an officer under his supervision issued summonses to Borough lifeguards who parked in metered parking spaces but failed to pay the meters while they were engaging in their morning "muster."  Defs.' Stmt. ¶47; Pl.'s Resp. ¶47; Compl. ¶36; Beining Aff. ¶13. Under Borough ordinance, it was a violation to park in a metered space without paying for same.  Pl.'s Stmt. ¶64; Defs.' Resp. ¶64; Beining Dep. 106:22-109:24.   After Plaintiff issued these summonses to the lifeguards, the Mayor and Council adopted an ordinance allowing the lifeguards to park in those spots during a designated period of time in the morning.  Defs.' Stmt. ¶49; Pl.'s Resp. ¶49; Pl.'s Stmt. ¶64; Defs.' Resp. ¶64; Beining Dep. 107:12-21.

In August of 2003, Plaintiff complained, both orally and in writing, to Chief Beining about the behavior of Officer Condos, whom Plaintiff had witnessed assault someone.  Defs.' Stmt. ¶53; Pl.'s Resp. ¶53; Pl.'s Answers to Interrogs. ¶10.   Chief Beining told Plaintiff to handle the situation himself.  Pl.'s Stmt ¶19; Defs.' Resp. ¶19.   Thereafter, Plaintiff spoke to Officer Condos himself and counseled him on better ways he could have handled the situation to prevent that type of incident from happening in the future.  Defs.' Stmt. ¶53; Pl.'s Resp. ¶53; Pl.'s Dep. 110:17-19; Beining Aff. ¶15.   Chief Beining did not institute an internal affairs investigation regarding the incident or further discipline Officer Condos.  Defs.' Stmt. ¶54; Pl.'s Resp. ¶54; Beining Aff. ¶15.   Plaintiff submitted other complaints to Chief Beining in writing. Defs.' Stmt. ¶55; Pl.'s Resp. ¶55.   Chief Beining would address these issues himself or tell Plaintiff "that's just the way things got to be." Defs.' Stmt. ¶55; Pl.'s Resp. ¶55; Pl.'s Dep. 109:3-6.

During the course of Plaintiff's employment with the Department, Chief Beining sent Plaintiff to various training courses. Defs.' Stmt. ¶59; Pl.'s Resp. ¶59; see also Pl.'s Stmt ¶21. Some of these courses were far away from Seaside Park and Plaintiff informed Chief Beining that the same or similar courses were being offered at closer destinations. Pl.'s Stmt. ¶21; see also Pl.'s Resp. ¶59. Plaintiff alleges that Chief Beining sent him to these courses in order to "make his life miserable." Def.'s Stmt. ¶59; Pl.'s Resp. ¶59. Notwithstanding, Plaintiff believed that the training courses were beneficial and was "happy to go" even if he had to drive three hours to get there. Defs.' Stmt ¶59; Pl.'s Resp. ¶59. At least two of the training courses Plaintiff was sent to would be beneficial if he were to apply for a law enforcement job outside of Seaside Park. Defs.' Stmt. ¶61; Pl.'s Resp. ¶61. Further, the training courses, as well as the time spent traveling, took place during Plaintiff's shift, so there was no impact on his earnings or any other conditions of employment when he had to travel for training courses. Defs.' Stmt. ¶60; Pl.'s Resp. ¶60; Pl.'s Dep 125:18-126:3.

In the Spring of 2006, Chief Beining directed Department personnel to place fliers on vehicles in town advising people not to park in the wrong direction or threatening the issuance of summonses. Pl.'s Stmt. ¶31; Defs.' Resp. ¶31.

During the years 2005 and 2006, members of the public filed several lawsuits against the Police Department, including Plaintiff specifically, for excessive use of force. Defs.' Stmt. ¶69; Pl.'s Resp. ¶69; Beining Aff. ¶16. At that time, the Borough had never before been sued for excessive force. Pl.'s Stmt. ¶29; Defs.' Resp. ¶29; Pl.'s Dep. 175:23-176:4. Chief Beining reviewed the arrest and incident reports that were the subject of the lawsuits against Plaintiff and determined that Plaintiff did not use excessive force, thus Chief Beining did not punish or

reprimand Plaintiff or order an internal affairs investigation at that time.  Defs.' Stmt. ¶72; Pl.'s Resp. ¶72; Being Aff. ¶16; see also Pl.'s Stmt. ¶71; Defs.' Resp. ¶71; Being Dep. 183:17-184:6.

On February 21, 2007, a federal jury in the civil matter of Bruno v. Seaside Park, et al., Civ. Action No. 04-5084, found that Plaintiff had used excessive force in violation of the constitutional rights of plaintiff Jose Roman.  Defs.' Stmt ¶73: Pl.'s Resp. ¶73.  The jury further found that Plaintiff maliciously falsified an investigation report in violation of the constitutional rights of plaintiffs Melanie Bruno and Melissa Bruno.  Defs.' Stmt. ¶74; Pl.'s Resp. ¶74.  Prior to the entry of judgment, however, the parties settled the Bruno litigation without any admission of wrongdoing or liability on the part of the named defendants, including Plaintiff.  Defs.' Stmt. ¶75; Pl.'s Resp. ¶75; Pl.'s Stmt ¶63; Defs.' Resp. ¶63; Being Dep. 105:3-24.

At the conclusion of the Bruno trial, the Borough attorneys formulated "guidelines" they wished Chief Being to follow. Pl.'s Stmt ¶54; Defs.' Resp. ¶54; Being Dep. 72:15-75:7.  One of these guidelines indicated that Plaintiff should temporarily be removed as the Department's designated use of force instructor.  Defs.' Stmt. ¶77; Pl.'s Answer to Interrogs. ¶22; Being Aff. ¶19; see also Defs.' Resp. ¶¶54, 56.  Plaintiff disputes that the removal was only temporary and subjectively believed he was being removed permanently.  Pl.'s Stmt; ¶34; Pl.'s Resp. ¶77; see also Defs.' Stmt. ¶78; Pl.'s Resp. ¶78.  Ultimately, Chief Being followed the recommendation of the Borough attorneys, removed Plaintiff from his use of force instructional duties and informed him that the other firearms instructor would do the spring training.  Pl.'s Stmt. ¶56; Defs.' Resp. ¶¶54, 56; Being Dep. 77:7-78:9.  The Department did not conduct a formal hearing when it removed Plaintiff as use of force instructor.  Pl.'s Stmt. ¶72; Defs.' Resp. ¶72;

Beining Dep. ¶186:5-8.  Though Plaintiff claims he was completely stripped of his job as Range Master of the Department, Chief Beining only removed Plaintiff in a limited capacity from his use-of-force training role.  Pl.'s Stmt. ¶56; Defs.' Resp. ¶56; Beining Dep. 80:5-20; see also Pl.'s Stmt. ¶36.  According to Defendants, Plaintiff remained responsible for overseeing the use-of-force training and running the qualification courses, and specifically remained in charge of making sure all of the officers were properly trained with their weapons and met State qualifications and the Attorney General's standards for the training for use-of-force.  Defs.' Resp. ¶56; Beining Dep. 82:12-16.  Furthermore, neither Plaintiff's rank nor pay were affected by the change in his duties.  Defs.' Stmt. ¶82; Pl.'s Resp. ¶82; Compl. ¶48; Pl.'s Dep. 214:16-17.

Additionally, during the car ride back from Trenton following the Bruno trial, Chief Beining told Plaintiff not to go out on patrol, to stay inside Department Headquarters during his shifts, not to write summonses or make arrests and not to have any contact with the public.  Pl.'s Stmt. ¶34; Defs.' Resp. ¶34.  Defendants concede that these directives were only issued to Plaintiff, but assert that he was the only officer found liable for use of excessive force in the Bruno trial.  Pl.'s Stmt. ¶¶34, 45, 65; Defs.' Resp. ¶¶34, 65.  Although Sergeant Boag was also found liable by the Bruno jury for maliciously falsifying an investigation report, he was not found liable for use of excessive force.  Defs.' Resp. ¶34.  Chief Beining did not change or diminish the role or limit or restrict the duties of any officer other than Plaintiff.  Pl.'s Stmt. ¶65; Defs.' Resp. ¶65; Beining Dep. 110:24-111:7.

In or about March 2007, after the conclusion of the Bruno trial, Mayor Matthies and the Council asked Chief Beining to issue a public statement about the trial, the other excessive force lawsuits and the Department's plan to prevent similar problems or lawsuits in the future.  Defs.'

Stmt. ¶85; Pl.'s Resp. ¶85; Beining Aff. ¶20. Plaintiff asked Chief Beining if he wanted Plaintiff to accompany him when he spoke to the media and was told that it would not be necessary. Defs.' Stmt. ¶86; Beining Aff. ¶21.  Subsequently, Chief Beining did make a statement to the media. Defs.' Stmt. ¶85; Pl.'s Resp. ¶85; Beining Aff. ¶20.  Plaintiff alleges that he was prohibited from communicating in any way with the Council or the public to dispel any rumors or misinformation concerning Plaintiff.  Pl.'s Stmt. ¶62; Defs.' Resp. ¶62; Pl.'s Resp. ¶86; Pl.'s Dep. 236:3-237:9.  However, Plaintiff concedes that the Chief of Police is designated by the Rules and Regulations of the Department as the sole spokesperson for the Department regarding police matters.  Defs.' Stmt. ¶87; Pl.'s Resp. ¶81; Beining Aff. ¶21; see also Pl.'s Stmt. ¶18; Defs.' Resp. ¶18.  The Rules and Regulations further state that "[m]embers of the Department shall not make public statements concerning the work, plans, policies, or affairs of the Department which may impair or disrupt the operation of the Department…."  Defs.' Stmt. ¶90; Pl.'s Resp. ¶90; Rules and Regulations at p63.

Plaintiff alleges that he requested to speak with a professional psychologist or psychiatrist as result of the stress and anxiety attendant to the Bruno verdict and the manner in which he was treated thereafter, but that Chief Beining denied such requests.  Pl.'s Stmt. ¶38; Pl.'s Dep. 215:7-271:25.  Defendants concede that Plaintiff asked to speak with a professional therapist on or about March 14, 2007 and the following day, however, Defendants contend that Chief Beining told Plaintiff that he would put together a program with the Department and would have Dr. Peters, the police psychologist, come in.  Defs.' Resp. ¶38; Pl.'s Dep. 215:7-11, 216:22-217:1.  Subsequently, Plaintiff consulted with his attorney and was told to see a doctor immediately.  Plaintiff was then given a note by his doctor recommending that he remain out of

work for three weeks.  Defs.' Resp. ¶38; Pl.'s Dep. 218:1-4, 8-11; <u>see</u> <u>also</u> Defs.' Stmt. ¶96; Pl.'s Resp. ¶96.

After the <u>Bruno</u> federal jury determined that Plaintiff had used excessive force, the Borough attorneys recommended that an internal affairs investigation be conducted.  Defs.' Stmt. ¶83; Pl.'s Resp. ¶83; Being Aff. ¶16-17; <u>see</u> <u>also</u> Pl.'s Stmt. ¶15; Defs.' Resp. ¶15. Chief Being followed the recommendation of Borough attorneys and commenced an internal affairs investigation.  Defs.' Stmt. ¶83; Pl.'s Resp. ¶83.  Plaintiff alleges that the Chief Being ordered the internal affairs investigation in retaliation for Plaintiff submitting a sick note from his physician.  Pl.'s Stmt. ¶15; Pl.'s Dep. 102:3-9.  Though Chief Being did order the internal affairs investigation chronologically following Plaintiff's submission of a sick note, Defendants aver that the investigation was ordered in response the federal jury's finding Plaintiff liable for excessive use of force, and not in response to the sick note.  Defs.' Resp. ¶15; <u>see</u> <u>also</u> Defs.' Stmt. ¶¶72, 83. Chief Being ordered another internal investigation against Plaintiff on or about July 1, 2007, regarding an allegation of abuse/improper conduct that occurred on June 11, 2005. Compl. ¶56.  Ultimately, none of the charges against Plaintiff were sustained. Defs.' Stmt. ¶83; Pl.'s Resp. ¶83; Pl.'s Dep. 219:21-25; <u>see</u> <u>also</u> Pl.'s Stmt. ¶39; Defs.' Resp. ¶39.

In or about April 2007, photographs were discovered being distributed at a Council meeting, that portrayed Plaintiff dressed in a Nazi uniform.  Defs.' Stmt. ¶94; Pl.'s Resp. ¶94; Compl. ¶46.  Plaintiff does not know who distributed the "photoshopped" Nazi photograph, but, to his knowledge, neither Chief Being nor any other defendant "respond[ed] in any positive manner" or made an effort to cease distribution.  Defs.' Stmt. ¶¶94, 95; Pl.'s Resp. ¶¶94, 95;

13

Pl.'s Answer to Interrogs. ¶21; Compl. ¶46.  Notwithstanding, Plaintiff did not voice a complaint about Defendants' alleged inaction.  Defs.' Stmt. ¶95; Pl.'s Resp. ¶95.

Plaintiff last worked on or about March 16, 2007.  He obtained a doctor's note to take time off from work due to stress and high blood pressure, Defs.' Stmt. ¶96; Pl.'s Resp. ¶66; Pl.'s Dep. 201:5-202:8.   On May 4, 2007, Plaintiff applied for disability retirement with an Employee's Service Terminated date of April 30, 2007.  Defs.' Stmt. ¶98; Pl.'s Resp. 98; see Employer Certification of Disability Benefit attached to the Affidavit of Eric L. Harrison, Esq. as Exhibit I.  Following his disability retirement application, Plaintiff was determined to be entitled to ordinary disability retirement, for which he received/receives 40 percent of base salary.  Pl.'s Stmt. ¶41; Defs.' Resp. ¶41.  Plaintiff did not appeal the State's decision finding him eligible for regular, as opposed to traumatic, disability.  Defs.' Stmt. ¶101; Pl.'s Resp. ¶101.

On or about August 7, 2007, Defendants cancelled Plaintiff's health benefits.  Compl. ¶58.  Additionally, the Borough did not make payments to Plaintiff on two separate occasions during the pendency of Plaintiff's disability application.  Compl. ¶59.  Plaintiff alleges that the cancellation of his health benefits was an act of retaliation by Borough Administrator Julie Horner-Keizer.  Defs.' Stmt. ¶99; Pl.'s Resp. ¶99.  Additionally, Plaintiff alleges that, on or about December 2007, Defendant Horner-Keizer assured Plaintiff that "in the event the PBA received/was awarded health insurance benefits as a result of then-ongoing contract negotiations," Plaintiff would also receive the same benefits.  Compl. ¶65.  Plaintiff asserts that the aforesaid negotiations should have been concluded on or before December 31, 2008 and that Defendants intentionally delayed the negotiation process in order to deprive Plaintiff of health insurance benefits to which he would otherwise have been entitled.  Compl. ¶67.

Plaintiff asserts that he is entitled to health benefits for himself and his family because two prior Borough employees who retired because of work-related disabilities received health benefits for themselves and their families. Defs.' Stmt. ¶100; Pl.'s Resp. ¶100. Plaintiff claims that he was not provided with lifetime health benefits because Defendants do not like him. Defs. Stmt. ¶102: Pl.'s Resp. 102. Plaintiff concedes, however, that under the CBA applicable to Plaintiff, one must work 25 years in order to obtain lifetime health benefits and at the time Plaintiff retired, he had not worked 25 years. Defs.' Stmt. ¶103; Pl.'s Resp. ¶103.

Plaintiff was continuously employed until January 1, 2008, when he was approved for disability retirement, with a service termination date noted as December 31, 2007. Defs.' Stmt ¶2; Pl.'s Resp. ¶2. At the time of his disability retirement, Plaintiff had attained the level of Police Sergeant. Compl. ¶15. As a police officer appointed through the civil service process, Plaintiff could not be terminated without notice, a hearing and an opportunity to defend himself. Defs.' Stmt. ¶51; Pl.'s Resp. ¶51; Pl.'s Dep. 160:18-25. During Plaintiff's entire career, he never received a formal disciplinary notice or preliminary notice of disciplinary action. Defs.' Stmt. ¶52; Pl.'s Dep. 161:6-11.

**DISCUSSION**

**I. Standard of Review**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has

the ability to "affect the outcome of the suit under governing law."  Kaucher v. County of Bucks,

455 F.3d 418, 423 (3d Cir. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,

106 S.Ct. 2505, 91 L.Ed. 202 (1986).   Disputes over irrelevant or unnecessary facts will not

preclude a grant of summary judgment.   Anderson, 477 U.S. at 248.   "In considering a motion

for summary judgment, a district court may not make credibility determinations or engage in any

weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all

justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241,

247 (3d Cir. 2004) (quoting Anderson, 447 U.S. at 255); see also Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Curley v. Klem,

298 F.3d 271, 276-77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for

summary judgment.   Celotex, 477 U.S. at 330.   "When the moving party has carried its burden,

the nonmoving party must 'set out specific facts showing a genuine issue for trial."  Betts v. New

Castle Youth Development Center, -- F.3d --, 2010 WL 3528902, * 1 (3d Cir. Sept. 13, 2010).

"A nonmoving party has created a genuine issue of material fact if it has provided sufficient

evidence to allow a jury to find in its favor at trial."  Gleason v. Norwest Mortg., Inc., 243 F.3d

130, 138 (3d Cir. 2001).   The non-moving party must present "more than a scintilla of evidence

showing that there is a genuine issue for trial."   Woloszyn v. County of Lawrence, 396 F.3d 314,

319 (3d Cir. 2005) (quotations omitted).   Under Anderson, Plaintiff's proffered evidence must be

sufficient to meet the substantive evidentiary standard the jury would have to use at trial.   477

U.S. at 255.   To do so, the non-moving party must "go beyond the pleadings and by her own

affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324 (quotations omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586; <u>Ridgewood Bd. of Ed. v. Stokley</u>, 172 F.3d 238, 252 (3d Cir. 1999).  "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment."  <u>Betts</u>, 2010 WL 3528902, at *1.  In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  Credibility determinations are the province of the factfinder.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.  Plaintiff's Free Speech Claims

The First and Second Counts of the Complaint allege that Defendants violated Plaintiff's right to free speech under the First Amendment of the United States Constitution and Article I of the New Jersey Constitution, respectively.  The First Cause of Action is potentially actionable under 42 U.S.C. §1983 and the Second under the New Jersey Civil Rights Act of 2004 ("NJCRA"), codified at N.J.S.A. 10:6-2(c).  New Jersey courts rely on federal First Amendment principles when interpreting the free speech clause of the New Jersey Constitution.  <u>Johnson v. Yurick</u>, 156 F.Supp.2d 427, 436 (D.N.J. 2001), <u>aff'd</u> 39 Fed. Appx. 742 (3d Cir. 2002); <u>Binkowski v. State</u>, 322 N.J. Super. 359, 369 (App. Div. 1999).  The same analysis a district court applies to First Amendment free speech claims applies as well to free speech claims under the New Jersey Constitution.  <u>Id.</u>  Therefore, this Court will discuss Plaintiff's federal and state free speech claims together.

Plaintiff asserts that Defendants refused "to allow the plaintiff to speak on his behalf and/or address, to interested parties, including members of the public and Seaside Park Borough residents, issues, concerns and/or rumors which had been raised and/or spread about the plaintiff." Compl. ¶ 71. Plaintiff also alleges that Defendants "retaliated against [him] and/or created … a hostile work environment in retaliation for plaintiff engaging in federally-protected speech and/or expressing his interest in engaging in federally-protected speech or otherwise attending to the duties of his employment." Compl. ¶ 72. Accordingly, Plaintiff's Complaint can be read to assert two types of First Amendment claims - one based upon retaliation for having exercised First Amendment rights (Compl.¶ 72) and one based upon the suppression of the right to exercise First Amendment rights (Compl. ¶ 71).

Defendants argue that Plaintiff's free speech claims fail because he did not engage in constitutionally protected conduct. Additionally, Defendants contend that, other than his free speech claim relating to his inability to speak in connection with the finding of excessive force in the Bruno trial in March 2007, Plaintiff's free speech claims are barred by the two-year statute of limitations. The Court turns first to whether Plaintiff's claims are time-barred.

### 1. Statute of Limitations

"A section 1983 claim is characterized as a personal-injury claim and is thus governed by the applicable state's statute of limitations for personal-injury claims." Druz v. Noto, Civ. No. 09-5040, 2010 U.S. Dist. LEXIS 53348 at *34 (D.N.J. May 28, 2010) (quoting Dique v. New Jersey State Police, 603 F.3d 181, 185 (3d Cir. 2010)). In New Jersey, all claims for personal injury are subject to a two-year statute of limitations. N.J.S.A 2A:14-2. Therefore, the statute of limitations for a section 1983 claim in New Jersey is two years. Dique, 603 F.3d at 185; see also

Cito v. Bridgewater Twp. Police Dep't, 892 F.2d 23, 25 (3d Cir. 1989).  Defendants argue that any claims based on conduct occurring prior to February 26, 2007 (i.e., two years prior to the filing of Plaintiff's Complaint) are time-barred.[3]  Accordingly, the dispute centers on when Plaintiff's claims accrued.

Plaintiff appears to argue that because he alleges a hostile work environment claim involving a continuing violation, his claims did not accrue until Defendants "prohibited plaintiff from speaking to the public and/or Borough council following the jury's verdict in the Bruno trial and prior thereto."  Pl.'s Br. Mot. Summ. J.  at 3.  In his brief, Plaintiff merely states, without citation, that his claim is not time-barred because the Bruno jury "returned its verdict and Chief Beining's mandate to plaintiff occurred in March of 2007," i.e., within the two-year limitations period.

"The accrual date of a §1983 cause of action is a question of federal law that is not resolved by reference to state law."  Wallace v. Kato, 549 U.S. 384, 388 (2007) (emphasis in original).  For section 1983 claims, accrual occurs "when the plaintiff has a complete and present cause of action -- in other words, when the plaintiff can file suit and obtain relief."  Druz, 2010 U.S. Dist. LEXIS 53348 at *35 (quoting Chen v. Twp. of Fairfield, 354 Fed. Appx. 656, 659 (3d

---

[3]      Although the parties are silent as to whether the two-year statute of limitations applies to Plaintiff's NJCRA claim as well as the § 1983 claim, other courts have indeed found that the same statute of limitations applies to both.  See Gracia-Brwon v. City of Newark, No. 09-3752 (GEB), 2010 WL 1704748, * 4 (D.N.J. Apr. 26, 2010) ("Although the NJCRA contains no express statute of limitations, see Owens v. Feigin, 194 N.J. 607, 611, 947 A.2d 653 (2008) (per curiam) (noting the NJCRA's dearth of procedural requirements), the language of New Jersey's generally-applicable personal injury statute of limitations, combined with the NJCRA's similar purpose and design to § 1983, which has employed state statutes of limitations since the Supreme Court's ruling in Wilson v. Garcia, 471 U.S. 261, 279-280, 105 C.Ct. 1938, 85 L.Ed.2d 254 (1985), convinces this Court that New Jersey's two-year limitation applies to the NJCRA.") (footnote omitted) (citing Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety, Civ. No. 02-5470, 2007 WL 1038920, at * 3 (D.N.J. Mar. 29, 2007)).

Cir. 2009) (quoting Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc., 522 U.S. 192, 201, 118 S. Ct. 542, 139 L. Ed. 2d 553 (1997) (internal quotations omitted))); see also Dique, 603 F.3d at 185 ("[T]he tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages.") (quoting Wallace, 549 U.S. at 391).

In AMTRAK v. Morgan, 536 U.S. 101, 122 S. Ct. 206, 153 L. Ed. 2d 106 (2002), the Supreme Court "established a bright-line distinction between discrete acts which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim."  O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006).  Events constituting a hostile workplace environment may occur at any time "so long as they are linked in a pattern of actions which continues into the applicable limitations period.  Id. (citing Morgan, 556 U.S. at 105) ("Consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period.").  In contrast, discrete events that are individually actionable "must be raised within the applicable limitations period or they will not support a lawsuit.  Id. (citing Morgan, 556 U.S. at 113) ("Discrete discriminatory acts are not actionable if time barred, even if they are related to acts alleged in timely filed charges.  Each discriminatory act starts a new clock for filing charges alleging that act.").

Although Morgan was decided in the context of a Title VII employment discrimination claim, the Third Circuit has held that the "principles at work in Morgan apply with equal force to §1983 claims."  O'Connor, 440 F.3d at 128.  Moreover, "time-barred claims cannot be

resurrected by being aggregated and labeled continuing violations." Id. at 129.  The O'Connor court further found Morgan to provide "fairly precise guidance as to what sorts of acts are 'discrete'" and formulated a "non-exhaustive list of discrete acts for which the limitations period runs from the act: termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation." Id. at 127.

The O'Connor court additionally held "the Morgan rule that individually actionable allegations cannot be aggregated is of particular import in the context of First Amendment retaliation claims.  First Amendment retaliation claims are always individually actionable, even when relatively minor." Id. at 128.  Even seemingly trivial acts of retaliation may be actionable if intended to punish an individual for exercising her free speech rights if it would be sufficient to deter an individual of ordinary firmness from exercising his or her First Amendment rights. Id.; see also Suppan v. Dadonna, 203 F.3d 228, 234-35 (3d Cir. 2000).  "A First Amendment retaliation claim will lie for any individual act which meets this deterrence threshold, and that threshold is very low: … a cause of action is supplied by all but truly de minimis violations." O'Connor, 440 F.3d at 128 (internal quotations and citation omitted).

Here, Plaintiff alleges that Defendants retaliated against him by reprimanding him for lawfully performing his duties, changing his shift, sending him to geographically inconvenient training courses, assigning him extra and abnormal work, and ignoring his complaints.  Although Plaintiff cites Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000), arguing that "[i]t is generally a question of fact as to whether or not a retaliatory campaign of harassment reached the threshold of actionability under Section 1983," Plaintiff provides absolutely no argument as to why the retaliatory events identified were not discrete retaliatory acts.   The Court finds that under

Morgan and O'Connor, the retaliatory acts alleged here clearly fall into the category of discrete acts, and therefore cannot be aggregated under a continuing violations theory.  O'Connor, 440 F.3d at 128.   Because the retaliatory acts alleged here constitute discrete acts, Plaintiff was required, under Morgan, to sue within two years of the occurrence of each of these alleged incidents.  Id. at 129.   Each of the challenged incidents is individually actionable when it occurred, thus, each First Amendment retaliation claim must have been brought individually prior to the expiration of the applicable limitations period.  See Livingston v. Borough of McKees Rocks, 223 Fed. App'x 84, 89, n.3 (3d Cir. 2007).  Having failed to file suit within two years of these alleged incidents, the statute of limitations bars Plaintiff from doing so now. Indeed, Plaintiff himself testified during his deposition that, in the two years prior to filing the Complaint, the only retaliation he endured for engaging in free expression was in not being allowed to speak publicly about the results of the Bruno trial.   Pl.'s Dep. 236:18-237:9. Accordingly, the Court finds that all but Plaintiff's free speech claim centering on the events following the Bruno trial are time barred.

### 2.   Plaintiff's Free Speech Claim Fails On The Merits

Turning to Plaintiff's allegations centering on the events following the Bruno trial, it is not entirely clear whether Plaintiff is attempting to assert a retaliation claim or a claim based upon the suppression of the right to exercise his First Amendment Rights.  Plaintiff appears to allege that the act of not permitting him to speak to dispel rumors about himself was not only suppression, but a form of retaliation for his prior exercise of free expression and/or that he was retaliated against following his request to speak.  Defendants assert Plaintiff's speech is not protected because he was not speaking as a citizen on a matter of public concern, and

furthermore, that Defendants, as a government employer, had adequate justification for treating Plaintiff differently than the general public.

"The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). "A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." Hill v. Borough of Kutztown, 455 F.3d 225, 242-243 (3d Cir. 2006) (quoting Garcetti, 547 U.S. at 418). "In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Independence Township, 463 F.3d 285, 296 (3d Cir. 2006); see also Baldassare v. New Jersey, 250 F.3d 188, 194-95 (3d Cir. 2001) ("A public employee's retaliation claim for engaging in protected activity must be evaluated under a three-step process."). Accordingly, to sustain either the suppression claim or the retaliation claim, the Court must find that Plaintiff has alleged constitutionally protected conduct.

Although the Court has serious concerns as to whether Plaintiff was speaking as a private citizen on a matter of public concern, the Court need not resolve the issue as Plaintiff's claims still fail under the third prong of Garcetti. As Defendants point out, the Department has adequate justification for regulating Plaintiff's speech differently than members of the general

public.  Pickering v. Bd. of Educ., 391 U.S. 563, 568-69 (U.S. 1968).  "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."  Garcetti, 547 U.S. at 418.

Under Pickering, a public employee's "speech is protected if the interests of the public employee 'in commenting upon matters of public concern' outweigh 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  Ober v. Evanko, 80 Fed. Appx. 196, 200, 2003 U.S. App. LEXIS 23040 at *10 (3d Cir. 2003) (quoting Pickering, 391 U.S. at 568), cert. denied, 541 U.S. 988.  The Third Circuit has recognized that a police department, as a law enforcement agency, has "wide latitude to regulate an employee's speech when that speech impacts on areas such as discipline, morale, harmony, uniformity, and trust in the ranks."  Ober, 80 Fed. Appx. at 201.

In Ober, the Third Circuit found that a Pennsylvania Police Officer's right to violate department regulations by presenting grievances to a member of the department other than his superior was not protected by the First Amendment.  Id. at 201.  In that case, there were established regulations requiring officers to report suspected wrongdoing by other members to their superiors.  The Third Circuit found that under Pickering, the balance of interests favored the state, and the plaintiff failed to show that his interest in speaking outside the chain of command outweighed the State's interest in maintaining order, trust, discipline and efficient communication, and therefore his speech was not protected.  Id.

The Third Circuit has also recognized that when the actions taken by a police department are aimed solely at controlling an employee's activities within the department, this factor weighs

in favor of the police department's interest in regulating a public employee's speech.  See Persico v. City of Jersey City, 67 Fed. Appx. 669, 674 (3d Cir. 2003).  In Persico, the retaliatory actions alleged included Internal Affairs Unit investigations, referral of the matter to the prosecutor's office, an order to stop investigating, and a disciplinary hearing.  Id.  The Third Circuit found that all of these actions were "aimed at maintaining order and discipline within the Police Department."  Id.  (Citing Kelley v. Johnson, 425 U.S. 238, 246, 47 L. Ed. 2d 708, 96 S. Ct. 1440 (1976) (recognizing the need to accord police departments wide latitude in decisions that impact "discipline, esprit de corps, and uniformity")).

Here, Plaintiff alleges that Chief Beining ordered him not to attend public meetings or communicate with the Council or its members.  However, under the Department's Rules and Regulations, members of the Department are not allowed to make "public statements concerning the work, plans, policies, or affairs of the Department which may impair or disrupt the operation of the Department …."  Rules and Regulations, at p. 63, ¶11.  Further, the Rules and Regulations prohibit members of the Department from "reveal[ing] any confidential business of the Department … [nor] impart confidential information to anyone except for whom it is intended."  Rules and Regulations at p. 56, ¶7a.  Additionally, the "[c]ontents of any Department record or report filed in the Department shall not be exhibited or divulged to any person, except on approval of the Chief of Police, or under due process of law, or as permitted under Department Regulations."  Rules and Regulations at p. 56, ¶7c.

The Rules and Regulations also designate the Chief of police as "the chief executive officer of the Department and the final Departmental authority in all matters of policy, operations and discipline."  Rules and Regulations at p. 17.  It is the chief's responsibility to

"[c]onfer with Seaside Park Borough Officials in determining plans and policies to be observed in the conduct of the Department" and to "[f]ormulate Departmental policies, regulations, goals, and program priorities in consultation with municipal officials and with the assistance of subordinate officers."  Rules and Regulations at p. 17.  Essentially, the Rules and Regulations make the Chief of Police the sole spokesperson of the Department.  Further, N.J.S.A. 40A:14-118, commonly referred to as the "Chief's Bill of Rights," grants the Chief of Police the authority to "administer and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel."  N.J.S.A. 40A:14-118.

Even if the statements Plaintiff wished to make concerning safety issues and the excessive use of force lawsuits were matters of public concern, Plaintiff has not demonstrated that his interest in this speech outweighs the Department's interest in the effective and efficient provision of its services.   Under the Rules and Regulations, Chief Beining was effectively the sole spokesperson for the Department, and further, Plaintiff was specifically prohibited from making public statements concerning Department affairs, policies, work and plans that could be disruptive to the Department's operations.  Such rules and regulations are designed to promote efficiency and maintain order and discipline within the Department.  Therefore, to the extent Plaintiff was prohibited following the Bruno trial from making public statements or addressing the Council, Chief Beining's actions were justified under the Department's Rules and Regulations and N.J.S.A. 40A:14-118.  Further, the Department's need to enforce compliance with its rules and regulations was heightened following the Bruno jury finding Plaintiff liable for excessive use of force and falsifying a report.  Clearly, the Department's need to enforce compliance with its rules and regulations outweighs Plaintiff's interest in making public

statements. It is apparent from the record that Chief Beining's actions were directed at controlling Plaintiff's activities within the Department, which clearly weighs in favor finding that the Department had adequate justification in regulating Plaintiff's speech.  Indeed, as the record reveals, the Department had not yet completed its internal investigation surrounding the incidents alleged in the <u>Bruno</u> trial.  Clearly the Department had justification in preventing Plaintiff from speaking out independently regarding those incidents.

Accordingly, because Plaintiff's interest in speaking does not outweigh the Department's interest in regulating the speech of its employees and maintaining order and discipline, the speech Plaintiff sought to make was not entitled to constitutional protection.

### III.  Plaintiff's Discrimination Claims

The Fifth Cause of Action in the Complaint asserts that Defendants "discriminated against the plaintiff based upon plaintiff's personal appearance and/or disability, in violation of Federal and State law."  Compl. ¶88.  Although the Complaint does not specifically mention any particular Federal and State laws, Defendants argue any claim Plaintiff may attempt to assert under either the Americans with Disabilities Act ("ADA") or the New Jersey Law Against Discrimination ("NJLAD") fails as a matter of law.  Defs.' Br. Mot. Summ. J. at 32.  Plaintiff's Opposition Brief responds to Defendants' ADA and NJLAD arguments and does not attempt to assert a claim under any other Federal or State law.  Accordingly, the Court will address Plaintiff's discrimination claims under the ADA and NJLAD respectively.

#### 1.  Americans with Disabilities Act

Defendants argue that Plaintiff's ADA claim fails as a matter of law because Plaintiff did not plead in his Complaint that he filed a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC") or the New Jersey Division of Civil Rights, and also failed to produce evidence of such a filing.  Defs.' Br. Mot. Summ. J. at 32.  In his Opposition Brief, Plaintiff concedes that he did not plead that he filed a prior complaint with the EEOC or the New Jersey Division of Civil Rights, and is furthermore unable to produce evidence of such a filing. Pl.'s Br. Mot. Summ. J. at 13.

It is well established in the Third Circuit that a plaintiff bringing employment discrimination charges under the ADA must follow the administrative procedures set forth in Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C §2000e-5 ("Title VII").  See 42 U.S.C. §12117; Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006); Ditzel v. Univ. Med. & Dentistry, 962 F.Supp. 595, 602 (D.N.J 1997); Bishop v. Okidata, Inc., 864 F.Supp. 416, 424 (D.N.J. 1994).  Title VII requires an aggrieved party to file, within 180 days of the alleged discriminatory practice, a charge with the EEOC and receive a "right to sue" letter before brining an action against the respondent named in the charge.  Peterson v. City of Long Branch, No. 08-3452, 2009 U.S. Dist. LEXIS 22178 at *35 (D.N.J March 19, 2009) (citing 42 U.S.C. §2000e-5).

Here, it is not disputed that Plaintiff failed to plead in his Complaint that he filed a charge of discrimination with the EEOC or the New Jersey Division of Civil Rights.  Accordingly, Plaintiff's ADA claim is dismissed as a matter of law for failure to exhaust administrative remedies.

## 2.  New Jersey Law Against Discrimination

Plaintiff's Third Cause of Action alleges that Defendants' conduct made his working conditions so intolerable that he was constructively discharged and forced to retire.  Compl. ¶76,

78.  The Fifth Cause of Action alleges, "the defendants discriminated against the plaintiff based upon plaintiff's personal appearance and/or disability."   Compl. ¶88.  Defendants argue Plaintiff's NJLAD disability-discrimination claims are time-barred because Plaintiff was not discriminated against based on his weight or any other disability during the two years prior to filing this lawsuit.  Defendants further argue that Plaintiff's discrimination claim fails because Plaintiff is unable to establish a *prima facie* case of discriminatory harassment or discharge.

Plaintiff responds that his NJLAD claim is timely because his constructive discharge cause of action accrued at his time of retirement in March of 2007, and therefore is within the limitations period.  Plaintiff additionally argues that his disability-based discrimination claims under the NJLAD are not time-barred pursuant to the continuing violation doctrine, because the alleged discriminatory acts were part of a pattern, the last of which -- his constructive discharge -- occurred within the limitations period.  Specifically, Plaintiff avers that "Chief Beining's past perception of his appearance and weight issue … were factors in Chief Beining's decision to … strip the plaintiff of all of his duties as a police officer in March of 2007."  Pl.'s Br. Mot. Summ. J. at 4.  Furthermore, Plaintiff contends that he has made out a *prima facie* case for disability discrimination under the NJLAD.

### A.  Statute of Limitations

As discussed above, discrimination claims in New Jersey are subject to the same two-year statute of limitations applicable to personal injury claims.  N.J.S.A. 2A:14-2; see also Alexander v. Seton Hall University, 410 N.J. Super 574, 938 A.2d 1128, 1131 (App. Div. 2009) (Claims under the New Jersey Law Against Discrimination are subject to a two-year statute of limitations).  "The continuing violation doctrine is an equitable doctrine applicable to hostile

work environment claims that allows for the inclusion of evidence concerning harassment that would otherwise be barred by the statute of limitations." Ramirez v. UPS, No. 06-1042, 210 U.S. Dist. LEXIS 48351 at *14-15 (D.N.J. May 17, 2010) (citing Shepard v. Hunterdon Developmental Center, 174 N.J. 1, 18-23, 803 A.2d 611 (2002)).

> To establish a continuing violation under the NJLAD "a plaintiff must show that (1) at least one allegedly discriminatory act occurred within the filing period and (2) the discrimination is 'more than the occurrence of isolated or sporadic acts of intentional discrimination' [but] is instead a continuing pattern of discrimination." Once a plaintiff has met these requirements, he may recover for damages incurred as a result of the entire continuing violation. In determining the extent of the continuing violation, New Jersey courts consider three factors: "(i) subject matter -- whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence -- whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

Ramirez, 2010 U.S. Dist. LEXIS 48351 at *16-17 (quoting Alexander, 410 N.J. Super. at 580-81).

The purpose of the continuing violations doctrine is to remedy the inequity that can occur where a plaintiff only realizes that he has been unlawfully discriminated against "with the benefit of hindsight, after numerous discriminatory acts" by allowing a court to receive evidence of discriminatory acts that would otherwise be barred by the statute of limitations. Id. at *15 (quoting Hall v. St. Joseph's Hospital, 343 N.J. Super. 88, 103, 777 A.2d 1002 (App. Div. 2001) cert. denied 171 N.J. 336, 793 A.2d 715 (2002)). However, this rationale also serves to limit application of the continuing violations doctrine. Id. New Jersey courts have recognized that where a plaintiff knew, or should have known, that each act was discriminatory, plaintiff may not accumulate all the discriminatory acts and bring suit on all the acts based on the statutory period applicable to the last one. Id. at *16 (citing Hall, 343 N.J. Super at 103). Thus, the

continuing violation doctrine cannot be applied to bring discrete acts of discrimination within the statutory time limits.  See e.g. Montells v. Haynes, 133 N.J. 282, 286, 291-293, 627 A.2d 654 (1993).  Therefore, it is axiomatic that any claim under the NJLAD -- whether for hostile work environment or a discrete discriminatory act -- must be brought within the statutory limitations period.  Indeed, in order for a plaintiff to assert a hostile work environment claim under the NJLAD, at least one discriminatory act must have occurred within the statutory limitations period.  Shepherd, 174 N.J. at 7 (citing West v. Philadelphia Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995)).

In his Opposition Brief, Plaintiff asserts "Chief Beining's past perception of his appearance and weight issue, relative to the ongoing 'image' of the Police Department, were factors in Chief Beining's decision to … strip plaintiff of all his duties as a police officer in March 2007."  Pl.'s Br. Mot. Summ. J. at 4.  Plaintiff further avers that this was "the last straw" in a pattern of discriminatory acts spanning the entirety of his employment.  Therefore, Plaintiff argues that because this last act took place within two years of filing the Complaint, the continuing violations doctrine applies and his NJLAD claims are not barred by the statute of limitations.

To the extent Plaintiff argues that he testified at his deposition that he believed Chief Beining's decision following the Bruno trial was "motivated by old feelings about [his] appearance or [his] weight," Plaintiff merely said "I think that may have played into it," and further admitted he was merely speculating.  Pl.'s Dep. 197:10-15.  Moreover, Plaintiff admitted at deposition he did not feel that he was discriminated against because of his appearance or any disability at any time during the two-year period prior to filing the Complaint.  Pl.'s Dep. 239:3-

10.    For the continuing violation exception to apply, a plaintiff must allege at least one discriminatory act occurring within the limitations period.  <u>Alexander</u>, 410 N.J. Super. at 580; <u>Shepherd</u>, 174 N.J. at 18.  Plaintiff's admission that he was not discriminated against because of a disability or his appearance at any time during the two-years prior to filing the Complaint expressly contradicts his claim that Chief Beining's decision to "strip him of all his duties" was motivated by past feelings about Plaintiff's weight or appearance.

Even if Plaintiff could show that a pattern of discrimination occurred, his failure to demonstrate that "at least one of those acts occurred within the statutory limitations period" precludes the application of the continuing violation doctrine to his claims.  <u>Id.</u>  Furthermore, Plaintiff's admission that he was not discriminated against because of a disability or his appearance within two-years of filing the Complaint logically implies that any alleged discrimination occurred more than two years prior to filing.  Consequently, the statute of limitations bars Plaintiff from asserting these claims as well.

Since Plaintiff was not discriminated against based on his weight or any disability during the two years prior to filing the Complaint, the statute of limitations precludes him from asserting his discrimination claims under the NJLAD.

### B.  **Disability Discrimination**

Plaintiff claims that he was discriminated against because of his disability, past morbid obesity, in violation of the NJLAD.  He also asserts that it is undisputed that he was performing his work at a level that met his employer's legitimate expectations but was nonetheless required to labor under conditions which were unreasonably different from other employees.  Plaintiff

32

further argues that Defendants have failed to produce any legitimate, nondiscriminatory reasons for their actions.

Defendants argue that Plaintiff cannot demonstrate the elements of a *prima facie* claim for discriminatory harassment or discharge on the basis of a disability because Plaintiff cannot show that he was handicapped within the meaning of the law or that he experienced any adverse employment actions.   Further, assuming Plaintiff has established a *prima facie* case of discrimination, Defendant argues that Plaintiff cannot show that his past obesity was more likely than not a determinative cause of any alleged adverse employment action.

New Jersey has adopted the framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)[4], as the starting point in actions brought under the NJLAD.   <u>Andersen v. Exxon Co., U.S.A.</u>, 89 N.J. 483, 492, 446 A.2d 486 (1982).   Though the <u>McDonnell Douglas</u> analysis is followed in cases of discriminatory discharge, the elements of the *prima facie* case are modified to fit the circumstances.   <u>Bell v. KA Indus. Services, LLC</u>, 567 F. Supp. 2d 701, 706 (D.N.J. July 25, 2008); <u>Clowes v. Terminix Int'l., Inc.</u>, 109 N.J. 575, 596, 538 A.2d 794 (1988).   In order for a plaintiff to establish a *prima facie* case of discriminatory harassment, transfer or discharge because of a handicap or disability, he must establish that: (1)

---

[4] Under <u>McDonnell Douglas</u>, a plaintiff claiming unlawful discrimination must establish, by a preponderance of the evidence, a four-part prima facie case: (1) he belongs to a protected class; (2) he applied and was qualified for the position for which the employer was seeking applicants; (3) he was rejected despite adequate qualifications; and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. <u>Andersen v. Exxon Co., U.S.A.</u>, 89 N.J. 483, 492, 446 A.2d 486 (1982).   Once a plaintiff has established the prima facie case, the burden of proof shifts to the employer who may rebut the presumption of discrimination by providing a legitimate, non-discriminatory reason for the rejection. Id. at 491.   Then, the plaintiff may "prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination." Id.

he is disabled or perceived to have a disability;[5] (2) the complainant had been performing his or her work at a level that met the employer's legitimate expectations; (3) the complainant was required to labor under conditions that were unreasonably different from those of other employees; and (4) (in the case of discriminatory transfer or discharge) the employer had sought another to perform the same work after complainant had been removed from the position. Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 481, 593 A.2d 750 (1991); Jansen v. Food Circus Supermarkets, 110 N.J. 363, 382, 541 A.2d 682 (1988).

Once the employee has satisfied his burden of establishing a *prima facie* case of discrimination under the LAD, the burden of production then shifts to the employer to rebut the *prima facie* case by "articulat[ing] some legitimate, nondiscriminatory reason" for its alleged unlawful action. Clowes, 109 N.J. at 596; see also Laresca v. AT&T, 161 F. Supp. 2d 323, 335 (D.N.J. 2001). "In order to defeat a summary judgment motion if the employer answers the plaintiff's *prima facie* case with [a] legitimate, nondiscriminatory reason[] for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Laresca, 161 F. Supp. 2d at 335-336; Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996), *cert. denied*, 521 U.S. 1129. In summary, when evaluating a plaintiff's discrimination claim, the Court engages in the following three step process:

---

[5] The LAD refers to "handicap", but defines handicap as a disability. Courts have generally used the terms interchangeably in this context. See State v. Dixon, 396 N.J. Super. 329, 339, 933 A.2d 978 (App. Div. 2007); Soules v. Mount Holiness Memorial Park, 354 N.J. Super. 569, 575, 808 A.2d 863 (App. Div. 2002)

(1) whether the plaintiff establishes a *prima facie* discrimination case;

(2) if so, the burden of production, not persuasion, shifts to the defendant to show a non-discriminatory reason for the decision;

(3) if the defendant meets this requirement, the plaintiff must show by a preponderance of the evidence that the non-discriminatory reason was pretext for discrimination.

McDonough v. Cooksey, Civ. No. 05-00135, 2007 U.S. Dist. LEXIS 38410, 2007 WL 1456202, at *3 (D.N.J 2007)[6] (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas, 411 U.S. at 802); Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

### a. Plaintiff's *Prima Facie* Case

Plaintiff argues that he has met all four elements of a *prima facie* case for discrimination under the NJLAD.  First, Plaintiff argues he was handicapped within the meaning of the law because he was determined on a medical level, to be morbidly obese, and his employer perceived his weight to be an issue for the Department, in terms of his individual job performance and/or the "image" of the Department on the whole.  Regarding the second element, Plaintiff claims it is undisputed that he was performing his job at a level which met his employer's legitimate expectations.  Next, Plaintiff argues he was required to work under conditions which were unreasonably different from other employees because: (1) he was sent, without justification, to

---

[6] In McDonough, the plaintiff claimed violations under Title VII and the NJLAD.  However, the McDonough court's interpretation of Title VII discrimination violations is applicable to the NJLAD discrimination violations.  McDonough, 2007 U.S. Dist. LEXIS 38410, 2007 WL 1456202 at n.2.  In fact, the New Jersey "Supreme Court has noted that, in construing the [NJLAD], federal precedent governing Title VII is 'a key source of interpretive authority.'" Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 268, 675 A.2d 684 (App. Div. 1996) (quoting Lehman v. Toys 'R' Us, Inc., 132 N.J. 587, 600-01, 626 A.2d 445 (1993)).

far-away seminars and training sessions; (2) he was forced to perform janitorial/clean-up duties, not within the scope of his job description; (3) he was transferred to a "one man detective bureau;" (4) he was told not to speak with anyone; and (5) ultimately, stripped of all of his duties.  As to the fourth element, Plaintiff asserts that his position as a police officer was not eliminated.  Defendants challenge the first prong of Plaintiff's *prima facie* case of discriminatory discharge, specifically arguing that Plaintiff had failed to demonstrate that his past obesity was a handicap under the NJLAD.

The threshold inquiry in a disability discrimination discharge case is whether the plaintiff fits the statutory definition of "handicapped."  Viscik v. Fowler Equip. Co., 173 N.J. 1, 15, 800 A.2d 826 (2002).  N.J.S.A. 10:5-5(g) states:

> "Handicapped" means suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.  Handicapped shall also mean suffering from AIDS or HIV infection.

There are two specific categories of handicap pursuant to N.J.S.A. 10:5-5(q): physical and non-physical.  Viscik, 173 N.J. at 15.  The two categories are "distinct from each other and provide separate ways of proving handicap.  Id.  "To meet the physical standard, a plaintiff must prove that he or she is (1) suffering from physical disability, infirmity, malformation or disfigurement (2) which is caused by bodily injury, birth defect or illness including epilepsy.  Id.

(citing N.J.S.A. 10:5-5(q))[7].  In contrast, "[t]o meet the non-physical standard, a plaintiff must prove that he or she is suffering (1) from any mental, psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."  Id. at 16.  When addressing obesity as a possible handicap under the NJLAD, New Jersey courts have applied the "physical disability" standard.  See Viscik, 173 N.J. at 17 (Finding that obese plaintiff had established physical handicap within the meaning of the NJLAD); Gimello v. Agency Rent-A-Car Sys., 250 N.J. Super. 338, 355, 594 A.2d 264 (App. Div. 1991) (characterizing obesity as a physical condition).

Plaintiff argues that he has met the first prong of his *prima facie* case because obesity has been deemed to be a handicap under the NJLAD.  To the extent that New Jersey courts have found obese plaintiffs able meet the "handicap" standard under of the NJLAD, Plaintiff is correct.  See Viscik, 173 N.J. at 17-18; Gimello, 250 N.J. Super. at 365.  However, the New Jersey Supreme Court was clear in Viscik that "each and every element" of the statutory test must be satisfied by a plaintiff alleging discrimination under the NJLAD.  Viscik, 173 N.J. at 17.

The Supreme Court in Viscik held that "[w]here the existence of a handicap is not readily apparent, expert medical evidence is required," recognizing that New Jersey courts "place a high premium on the use and strength of objective medical testimony in proving the specific elements" of a *prima facie* case under the NJLAD.  173 N.J. at 16 (citing Clowes, 109 N.J. at

---

[7] The notion of physical handicap includes, but is not limited to, the following: "Any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device."  Viscik, 173 N.J. at 15.

591-93); see also Gimello. 250 N.J. Super. at 365 (fact that plaintiff was obese was demonstrated by unrefuted medical evidence); Enriquez v. W. Jersey Health Sys., 342 N.J. Super. 501, 521, 777 A.2d 365 (finding plaintiff's course of treatment to be sufficient proof of his disability). Simply because obesity has been recognized as a handicap within the NJLAD definition of a disability, does not relieve Plaintiff of his duty to prove he has a disability.  Plaintiff must prove, by a preponderance of the evidence, that he has a disability, not that obesity itself is a disability under the NJLAD.

In Viscik, the Supreme Court found that the plaintiff's "obesity-based arthritis, heart condition and obstructive lung disease [were] clearly 'physical infirmities' under the first prong of the physical handicap test."  173 N.J. at 17.  As to the second prong -- that the infirmity be caused by "bodily injury, birth defect or illness" -- the plaintiff's expert testified that the plaintiff's "metabolic condition is genetic, that she suffered from it since birth, and that it is a direct cause of the obesity-based infirmities."  Id.  Additionally, the plaintiff testified about, and her expert attested to, the "limits her morbid obesity" imposed regarding her knee, "her inability to move around quickly and need for a cane," and "the effects of her asthma and shortness of breath."  Id. at 17-18.  The New Jersey Supreme Court found this evidence sufficient to establish that Viscik was handicapped within the meaning of the NJLAD.  Id. at 18.

Here, to establish he is handicapped under the NJLAD, Plaintiff asserts that, at one point in time, his physician expressed to him that he was morbidly obese, and that he underwent gastric bypass surgery.  Although Defendants dispute that Plaintiff has adequately proved that he fits the statutory definition of "handicapped,"[8] even if Plaintiff has established a *prima facie*

---

[8]      Defendants assert that Plaintiff's past obesity is not a handicap under the NJLAD because, prior to his gastric bypass surgery, Plaintiff felt fully capable of performing all of his duties as a

case, Plaintiff's NJLAD discrimination claim nonetheless fails because Defendants have presented legitimate non-discriminatory reasons for the alleged unlawful action.

### b. Non-Discriminatory Reasons for Defendants Actions

As stated above, if a plaintiff successfully establishes a *prima facie* case of discrimination, it creates a presumption of discrimination and the burden shifts to the employer to articulate legitimate, non-discriminatory reasons for its actions. Clowes, 109 N.J. at 596; LaResca, 161 F. Supp. 2d at 335. The employer, however, "carries only the burden of production, rather than persuasion, of showing a legitimate, nondiscriminatory reason for its action." Greenberg v. Camden County Vocational and Technical Schools, 310 N.J. Super 189, 199 (App. Div. 1998). The employer need only present evidence sufficient to raise a genuine issue of fact as to whether the plaintiff was discriminated against. Id. (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981)). "Once the employer sets fort a legitimate, nondiscriminatory reason for its adverse employment action, the burden again shifts to the employee to show that the employer's articulated reason 'was merely a pretext to mask the discrimination' or was not the true motivating reason for the employment decision." Id. (citing Kelly v. Bally's Grand, Inc. 285 N.J. Super. 422, 430, 667 A.2d 335 (App. Div. 1995). A

---

police officer and that his weight had no effect on the performance of his duties as a police officer or any other of his daily activities. Additionally, Plaintiff admitted at deposition that he did not consider his weight to be a disability, either before or after his surgery. To the extent the NJLAD prohibits discrimination on the basis of a perceived handicap, Defendants argue Plaintiff has presented no evidence that indicates any of his supervisors perceived his weight to be a handicap. Moreover, Defendant argues that if Plaintiff's obesity ever qualified as a disability, it terminated after he underwent gastric bypass surgery in December 2001. As to Plaintiff's argument that his disability was effectively acknowledged by virtue of the Borough granting him ordinary disability retirement, Defendants respond that his disability retirement was for his work-related stress in 2007, not for his obesity in 2001.

plaintiff meets this burden "by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Id. (quoting Texas Dep't of Community Affairs, 450 U.S. at 256).

When a defendant responds to a plaintiff's *prima facie* case by presenting legitimate, nondiscriminatory reasons for its actions:

> [T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons, …, was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)…. [To do so,] the non-moving [party] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," … and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Id. (citing Fuentes v. Perskie, 32 F.3d 759, 764-765 (3d Cir. 1994) (citations omitted)); Bally's Grand, 285 N.J. Super. at 431-32 (holding that "plaintiff need not provide direct evidence that the employer acted for discriminatory reasons in order to survive summary judgment[;]" rather, she "need only point to sufficient evidence to support an inference that the employer did not act for its proffered non-discriminatory reasons.").

Here, Plaintiff alleges that he was discriminated on account of his weight because he was: (1) reprimanded for accidentally discharging Officer Garbe's weapon in the locker room; (2) reprimanded for issuing summonses to Borough firefighters, residents and lifeguards; (3) reassigned to an investigator position in order to "take [him] out of uniform and … the public eye because [he] was overweight," Pl.'s Dep. 96:5-7; (4) forced to attend far-off seminars and training sessions; (5) forced to perform janitorial/clean-up type duties, which were not within the scope of his job description; (6) instructed not to speak with anyone; and (7) ultimately stripped

of all his duties.  Defendants argue that these actions do not constitute adverse employment actions, even if viewed in the aggregate, and to the extent any may be deemed adverse actions, they have produced legitimate, non-discriminatory reasons and Plaintiff has failed to produce evidence that the legitimate reasons proffered are pretext for prohibited discriminatory motivation.

Regarding the incident where Plaintiff accidentally discharged Officer Garbe's weapon, Plaintiff asserts that he was discriminated against because he was punished and, to his knowledge, Officer Garbe was not held accountable or punished.  Plaintiff believes Officer Garbe was not held accountable because Chief Beining did not allow Plaintiff to see the investigation materials relating to the incident.  Defendants respond that Plaintiff was reprimanded following the locker room incident for accidentally discharging Officer Garbe's gun in the locker room and Plaintiff does not dispute his responsibility for the incident. Defendants assert that Plaintiff was not allowed to see the investigation materials regarding the incident because, as Plaintiff admits, disciplinary materials concerning other officers are confidential, therefore Chief Beining had no duty, or right, to inform Plaintiff if and how Officer Garbe was punished or allow him to see the investigation report.

Concerning the three sets of summonses for which Plaintiff was allegedly reprimanded, Defendants argue that although Chief Beining did speak to Plaintiff about these summonses and did tell him that he should not have issued them, Plaintiff was not reprimanded or disciplined.  In any event, Plaintiff was not discriminated against because Chief Beining, as Chief of Police and Plaintiff's superior, had the right to inform his subordinates of Department practices and instruct him to perform his duties in compliance therewith.  Therefore, to the extent Chief Beining

thought Plaintiff should not have issued the summonses, it was within his right to inform Plaintiff of such.

Plaintiff also alleges that he was discriminated against because of his weight when Chief Beining reassigned him as an investigator in order to "take [him] out of uniform and … the public eye because [he] was overweight." Pl.'s Dep. 96:5-7. Defendants respond that Plaintiff was made an investigator because there was a need for the position. Moreover, Plaintiff testified at deposition that he believed he was reassigned as an investigator because Chief Beining "felt there was a need for that position to be filled." Pl.'s Dep. 96:1-4.

Regarding Plaintiff's allegation that he was discriminated against by being sent to seminars and training sessions, Defendants argue that this is not an adverse employment action because they were a part of Plaintiff's job and he did not lose any pay or other privilege of employment by attending. Moreover, Defendants assert, and Plaintiff admits, that the seminars were beneficial to Plaintiff. See Pl.'s Dep. 124:10-15.

As for being required to perform "janitorial/clean up" duties in the basement of Borough Hall, Defendants again deny that this was an adverse employment action or that it was motivated by any discriminatory intent. Defendants assert that the basement clean up was "something that needed to be done" and that other officers in addition to Plaintiff were assigned to this task. Moreover, Plaintiff admitted that the clean up was something that needed to be done and he was not the only officer required to do so. See Pl.'s Dep. 127:9-16, 127:22, 128:8-10.

Regarding Plaintiff's allegation that he was "instructed not to speak to anyone" and "ultimately stripped of all his duties," Defendants assert that Plaintiff was instructed to refrain from issuing summonses and removed from his position as use-of-force instructor because

Plaintiff was found liable for the use of excessive force by the Bruno jury. Defendants additionally assert that the Borough attorneys recommended that Plaintiff no longer do the use-of-force training. Defendants further assert that their legitimate, nondiscriminatory reason for temporarily taking Plaintiff off street duty and ordering an internal investigation was the federal jury finding Plaintiff liable for excessive force. Furthermore, Defendants argue that it is within the Department's best interest to show the community it serves that it does not tolerate the use of excessive force and that it will investigate such claims to ensure the community's safety.

Defendants argue that Plaintiff has not presented any evidence that their legitimate non-discriminatory reasons should not be believed or that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the Department's actions. Plaintiff underwent gastric bypass surgery in late 2001, while the events leading to his alleged constructive discharge did not occur until March 2007. Defendants point out that Plaintiff testified at deposition that "his hell" began after the Bruno verdict in 2007 when he was stripped of his police duties and the "beginning of the end" of his career was when an internal affairs investigation was instituted after the Bruno jury found him liable for using excessive force and falsifying a police report. Furthermore, although Plaintiff claims that the decision to strip him of his duties was motivated by Chief Beining's past feelings concerning Plaintiff's weight, he admitted at deposition that he did not experience any discrimination based on his weight within the two years prior to filing the Complaint. Although Plaintiff speculates that Defendants' actions were motivated by feelings about his past obesity, he has provided no evidence, other than his subjective belief, from which a jury could conclude that he was discriminated against because of his weight/past obesity. Rather, Plaintiff's Opposition Brief merely questions why

Defendants acted as they did and baldly asserts that Chief Beining has not explained what these actions were designed to accomplish. Merely questioning or disagreeing with an employer's asserted reasons for its actions does not amount to evidence from which a factfinder could reasonably disbelieve the reasons or believe they are a pretext for an invidious discriminatory reason.

Accordingly, Defendants motion for summary judgment as to Plaintiff's NJLAD claims is GRANTED.


## IV. **Plaintiff's Due Process Claims**

Although not asserted in a separate count, Plaintiff's Third Cause of Action alleges that Defendants violated his right of due process under Federal and State law. Plaintiff appears to assert that he has a property right protected by the Fourteenth Amendment in his rank within the Department and in his continued employment as a police officer with the Borough which was infringed upon by Defendants' actions. Plaintiff appears to predicate his claim on a violation of both procedural due process and substantive due process. In either case, the relevant question before the Court in determining whether the Fourteenth Amendment has been violated is whether Plaintiff had a protected interest in retaining his job as a police officer and/or in not having his rank reduced. The Court finds that summary judgment is appropriate here because Plaintiff has failed to demonstrate any deprivation of a property interest as required to pursue a due process claim under procedural or substantive due process; in the absence of such interest, Plaintiff cannot prevail on his due process claims.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  The Clause has both a procedural and substantive component; it governs the procedures by which a State may deprive persons of liberty and property and bars "certain government actions regardless of the fairness of the procedures used to implement them." Planned Parenthood v. Casey, 505 U.S. 833, 846, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992); Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); Nicholas v. Pa. State Univ., 227 F.3d 133, 138-139 (3d. Cir. 2000).

### 1. Procedural Due Process

In order to state a claim for deprivation of procedural due process rights, a plaintiff must allege that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law'." Hill, 455 F.3d at 233-34.  "[W]hether there is a protected interest sufficient to trigger constitutional protection is an issue of law." Clark v. Township of Falls, 890 F.2d 611, 617 (3d Cir. 1989).  The Court conducts a familiar two-part inquiry in analyzing a procedural due process claim:  the Court determines whether Plaintiff "was deprived of a protected interest, and, if so, what process was his due." Logan v. Zimmerman Brush, Co., 455 U.S. 422, 428 (1982); see also Holman v. Hilton, 712 F.2d 854, 858 (3d Cir. 1983).

Plaintiff alleges a property interest in his continued employment as a police officer and in not having his rank reduced.  Property interests are not created by the Constitution, but are created and defined by "existing rules or understandings that stem from an independent source

such as state law." Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it…He must, instead, have a legitimate claim of entitlement to it." Id. However, federal constitutional law, and not state law, determines whether those interests rise to the level of a "legitimate claim of entitlement" protected by the Fourteenth Amendment. Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978) (citations omitted).

Plaintiff asserts that a protected property interest in his continued employment and rank is created by N.J.S.A. 40A:14-147, which provides in pertinent part:

> no member or officer of the police department or force shall be removed from his office, employment or position for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations established for the government of the police department and force, nor shall such member or officer be suspended, removed, fined or reduced in rank from or in office, employment, or position therein, except for just cause as hereinbefore provided and then only upon a written complaint setting forth the charge or charges against such member or officer.

(Emphasis added).  Under the statute, therefore, it is clear that Plaintiff had a property interest in his position as a police officer.  See Kelly v. Borough of Sayerville, 107 F.3d 1073, 1077 (3d Cir. 1997).  Plaintiff also asserts that the statute also creates a protectable property interest in not having his rank reduced.  Defendants do not dispute that N.J.S.A. 40A:14-147 creates a property interest for Plaintiff to not be suspended, removed, fined or reduced in rank without a written complaint or hearing.  See Defs.' Br. Mot. Summ. J. at 40-41.

Plaintiff claims he was deprived of a protected property interest when he was "stripped of all of his duties" following the Bruno trial, which he characterizes as a demotion.  Although Plaintiff concedes that neither his job title was changed nor his pay reduced following the Bruno

trial, nonetheless he asserts that being "stripped of all of his duties" constitutes a constructive reduction in rank, thereby depriving him of his protected interest in not having his rank reduced. Defendants counter that Plaintiff did not experience any reduction in rank, actual or constructive, when Chief Beining temporarily changed Plaintiff's job assignments because Plaintiff does not have a property interest in particular job assignments absent a concomitant impact on salary, rank, or other benefits.

In Clark, the Third Circuit addressed the issue of whether a change of duties constitutes a constructive reduction of rank sufficient to trigger due process protection the same as would a formal reduction in rank. 890 F.2d at 617. Recognizing that property interests are created by state law, the Clark court looked to the Pennsylvania statute[9] to determine whether the plaintiff had a "legitimate claim of entitlement to the retention of his duties," and found that the plaintiff had a protected interest it not having his rank reduced. The court noted that while actual reduction in rank is indicated by a change in job title, in the case of a constructive reduction in rank, where "the officer's title has not been altered," "[a court] must look to other traditional indicia of change in rank to determine whether the employee's rank constructively has been

---

[9] This Court notes that although the Clark decision was based upon the Pennsylvania Police Tenure Act, 53 Pa.Cons.Stat.Ann. §812 (Purdon 1974), that statute is largely similar to the New Jersey statue at issue here. The Pennsylvania Police Tenure act states: "No person employed as a regular full time police officer in any police department of any township of the second class . . . shall be suspended, removed or reduced in rank except for the following reasons: [physical or mental disability; violation of any official duty; commission of crime; inefficiency, neglect, intemperance, disobedience of orders, or conduct unbecoming an officer; intoxication while on duty.]" cf. N.J.S.A 40A:14-147 (no permanent member or officer of the police department or force shall be removed from his office, employment or position for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations established for the government of the police department and force, nor shall such member or officer be suspended, removed, fined or reduced in rank from or in office, employment, or position therein, except for just cause as hereinbefore provided and then only upon a written complaint setting forth the charge or charges against such member or officer.)

reduced." Id. at 618.  As for the traditional indicia of change in rank: "[a] change in pay is the most obvious.  Other indicia may be the imposition of duties normally given to employees of a lower rank, substantially reduced responsibilities, termination of privileges of rank, and whether the changes or restrictions are temporary." Id.

Applying these criteria, the Third Circuit found that a temporary reassignment of duties did not amount to a constructive reduction in rank.  In that case, the plaintiff's duties were changed, however he "retained not only his lieutenant's rank but also his lieutenant's salary." Id.  Additionally, although "many of [the plaintiff's] duties were taken from him, he was not left without any job functions." Id.  Furthermore, notwithstanding the plaintiff's displeasure with the changes to his duties and subjective belief that he "had no job left," the duties he had were duties "generally performed by lieutenants and were not demeaning." Id.  Finally, the Third Circuit noted the changes to the plaintiff's duties were only for six weeks and this was "patently consistent with a temporary reassignment." Id.  Based on this evidence, the Third Circuit found that the plaintiff was not constructively demoted.[10] Id.  The court concluded that since the plaintiff "was not constructively reduced in rank, it follows as a matter of law that no property interest in his employment created by [the state statute] was infringed." Id. at 619.

The facts presented in the instant case are very similar to those in Clark.  Here, although Plaintiff's duties were changed following the Bruno jury verdict which found him liable for excessive use of force, he nonetheless remained a Sergeant, his pay was not reduced and he did not lose any other privilege of employment.  Pl.'s Dep. 214:16-17.  Additionally, although

---

[10] The Third Circuit did not hold in Clark that a change in duties could never constitute a constructive reduction in rank under the Police Tenure Act, only that no constructive demotion occurred based on the evidence presented in that case.  Clark, 890 F.2d at 618.

Plaintiff's duties were reduced following the <u>Bruno</u> jury verdict, Plaintiff was not "stripped of all of his duties."   Plaintiff claims that Chief Beining instructed him to do nothing at all following the <u>Bruno</u> trial and stripped his "complete job away from his as range master," but Chief Beining testified at deposition that he only removed Plaintiff in a limited capacity from his use-of-force training role.   Beining Dep. 80:5-20.   Chief Beining further testified that, as range master, Plaintiff remained responsible for overseeing the use-of-force training and running the qualification course.   Beining Dep. 80:18-81:2.   Specifically, Plaintiff remained in charge of making sure all the other officers were properly trained in the use of their weapons and met state qualifications and the attorney general's guidelines for the training for use-of-force.   Beining Dep. 82:12-16.   Furthermore, Chief Beining testified that Plaintiff was only being removed from his role as use-of-force instructor on a temporary basis for the spring qualification.   Beining Dep. 78:15-17.   Although Plaintiff may have subjectively believed that these changes to his duties were permanent, he admitted Chief Beining told him "that's just the way its going to be for now."   Pl.'s Dep 205:19-22.   Moreover, even if the changes to Plaintiff's duties would have been permanent, Plaintiff last worked on or about March 16, 2007, just days after Chief Beining allegedly "stripped him of all his duties" and instructed him to "sit on his hands" and do nothing. Thereafter, Plaintiff obtained a doctor's note recommending that he take three weeks off because of high stress and blood pressure, and he subsequently applied for disability retirement as of May 4, 2007, with an effective termination date of April 30, 2007.

Applying the traditional indicia of change in rank enunciated by the Third Circuit in <u>Clark</u>, this Court finds Plaintiff has not suffered a constructive reduction in rank.   Consequently,

as a matter of law, no property interest in Plaintiff's employment created by N.J.S.A 40A:14-147 was infringed.

Defendants also assert that Plaintiff had access to a procedure for challenging any alleged deprivation through the Collective Bargaining Agreement. Defendants therefore argue that, even if Plaintiff's property interests were infringed, Plaintiff's failure to take advantage of the procedures available under the Collective Bargaining Agreement is fatal to his due process claim.

"In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." Persico, 67 Fed. Appx. at 675 (quoting Alvin v. Suzuki, 227 F.3d 107, 117 (3d Cir. 2000)); see also Veggian v. Camden Bd. of Educ., 600 F. Supp. 2d 615, 623 (D.N.J. 2009) (To establish a violation of her right to procedural due process, plaintiff must show that a person acting under color of state law deprived her of a protected property interest and "that the state procedure for challenging  the deprivation does not satisfy the requirements of procedural due process.") (quoting DeBlasio v. Zoning Bd., 53 F.3d 592, 597 (3d Cir. 1995), overruled on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392 (3d Cir. 2003), cert. denied, 516 U.S. 93). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." Id. (quoting Alvin, 227 F.3d at 117). "[A] state cannot be held to  have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) (quoting Dusanek v. Hannon, 677 F.2d 538, 543 (7th

Cir. 1982)).  "A due process violation 'is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.'"  Id. (quoting Zinermon v. Burch, 494 U.S. 113, 126, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990)).

Here, Article V of the Collective Bargaining Agreement clearly sets forth the procedure for filing a grievance.  See "Collective Bargaining Agreement" at p. 4, Art. V.  Plaintiff has neither alleged that he has been prevented from utilizing the grievance procedures in the CBA nor alleged any facts to show that the grievance procedure set forth in the CBA did not provide him with an adequate remedy to the alleged deprivation.  Thus, Plaintiff's argument that he did not utilize the CBA's grievance procedures to present his complaints because doing so was futile is unpersuasive.  A plaintiff may not skip the procedures provided to him in order to "use the federal courts as a means to get back what he wants … even when the plaintiff contends that one part of the process afforded him was biased, so long as there were avenues of review available to him."  Persico, 67 Fed. Appx. at 675 (internal citations omitted) (citing Alvin, 227 F.3d at 119 ("An allegation that initial stages of a process had been biased does not mean that the later processes will be biased as well.")).  The grievance procedures set forth in the CBA constitute constitutional due process and Plaintiff was not deprived of due process; he chose to not take advantage of the process available.  To the extent that Plaintiff claims that his constitutional right to due process was violated because Defendants did not provide him with a written notice regarding the changes to his duties, this claim fails as well, since the Court has already found that Plaintiff was not constructively reduced in rank and thus Defendants were not required to provide Plaintiff with a written notice.

Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's due process claims is GRANTED.

## 2. Substantive Due Process

Plaintiff's substantive due process claim fails as well. The threshold inquiry in a non-legislative substantive due process claim is whether a plaintiff has a protected property interest to which the Fourteenth Amendment's due process protection applies. Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 140 (3d Cir. 2000) (quoting Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000), overruled on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392 (3d Cir. 2003), cert. denied, 516 U.S. 93)). Although it is well-settled that state-created property interests are entitled to protection under the procedural component of the Due Process Clause, "not all property interests worthy of procedural due process protection are protected by the concept of substantive due process." Id. (citing Reich v. Beharry, 883 F.2d 239, 243 (3d Cir. 1989)). "Rather, to state a substantive due process claim, "a plaintiff must have been deprived of a particular quality of property interest." Id. (quoting DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 598 (3d Cir. 1995)). "[W]hether a certain property interest embodies this 'particular quality' is not determined by reference to state law, but rather depends on whether that interest is 'fundamental' under the United States Constitution. Id. (citing Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 229, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985) (Powell, J., concurring)).

In Nicholas, the Third Circuit addressed the question of whether a state-employee's tenured employment is a fundamental property interest and held that such a property interest is not so fundamental as to be entitled to substantive due process protection. Id. at 142. The Third

Circuit found that tenured public employment is a "wholly state-created contract right" that "bears little resemblance to the other rights and property interests that have been deemed to fundamental under the constitution."   Id. at 143.   The Nicholas court held that public employment is not a property interest that is "deeply rooted in the Nation's history and traditions … [n]or does public employment approach the interests 'implicit in the concept of ordered liberty' like personal choice in matters of marriage and family."   Id. (quoting Homar v. Gilbert, 63 F. Supp. 2d 559, 576 (M.D. Pa. 1999)).   The Third Circuit viewed "public employment as more closely analogous to those state-created property interests that this Court has previous[ly] deemed unworthy of substantive due process than to the venerable common-law rights of real property ownership."   Id.

This Court has already concluded that Plaintiff's interest in particular duties of his employment was not subject to procedural due process protections.   As such Plaintiff has failed to demonstrate that he possessed an interest protected by the due process clause.   Moreover, even if this Court had found a protected interest in the particular duties of Plaintiff's employment, he would still have to demonstrate that this constitutes a "fundamental" interest under the United States Constitution.   However, in Nicholas, the Third Circuit already decided that an interest in continued public employment is not a fundamental property interest subject to substantive due process protection.   Because Plaintiff has failed to establish that he had a protected property interest worthy of substantive due process protection, his substantive due process claim fails.

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's Substantive Due Process claim is GRANTED.

## V.  **Plaintiff's Tortious Interference Claim**

Plaintiff's Fourth Cause of Action alleges that Defendants tortiously interfered with Plaintiff's employment agreement by virtue of "the harassing activities and/or pattern engaged in, condoned, and/or tolerated, or policy adopted by the defendants, and or other acts or omissions/failure(s) to act on the part of the defendants."  Compl. ¶85.  Defendants assert Plaintiff's tortious interference claim fails because Plaintiff failed to file a timely Notice of Claim, and furthermore fails to state a claim on which relief can be granted.  Defs.' Br. Mot. Summ. J. at 42.  Plaintiff concedes that he did not file a Notice of Claim within ninety days of the accrual of the claim, or at any time.  Pl.'s Br. Mot. Summ. J. at 18.

In order to bring a tort action against a "public entity or public employee" in New Jersey, the New Jersey Tort Claims Act ("NJTCA") requires a claimant to file a notice of claim with the entity within ninety days of the accrual of the claim or else be "forever barred" from asserting that cause of action.  County Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 174 (3d Cir. 2006) (citing N.J.S.A. 59:8-3 and -8). After the ninety-day period expires, the NJTCA allows a claimant, under certain circumstances, to petition the trial court to file a late Notice of Claim. Moon v. Warren Haven Nursing Home, 182 N.J. 507, A.2d 1174, 1176 (N.J. 2005) (citing N.J.S.A. 59:8-9).  The request must be made within one year of the accrual of the claim, and the claimant "must demonstrate 'reasons constituting extraordinary circumstances for his failure to file notice of claim within' the ninety-day period."  Id.; see also Leidy v. County of Ocean, 398 N.J. Super. 449, 455 (App. Div. 2008).

Plaintiff's Opposition Brief concedes that he did not file a Notice of Claim within 90 days of the accrual of the claim, or at any time.  Pl.'s Br. Mot. Summ. J. at 18.  Therefore, Plaintiff is "forever barred" from asserting a claim for tortious interference.  Therefore,

Defendants are entitled to judgment as a matter of law and their motion for summary judgment on the tortious interference claim is GRANTED.

**CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Complaint is dismissed in its entirety.

                                                   s/ Freda L. Wolfson
                                                  Honorable Freda L. Wolfson
                                                  United States District Judge

Dated: September 24, 2010